712 S.E.2d 1

The **STATE**, Respondent,

v.

Lawrence **BURGESS**, Appellant.

No. 4823.

Court of Appeals of South Carolina.

Heard Jan. 11, 2011.

Decided April 20, 2011.

Appellate Defender Kathrine H. Hudgins, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Deborah R.J. Shupe, Office of the Attorney General, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for Respondent.

FEW, C.J.

In Lawrence Burgess's appeal from his conviction for possession of crack cocaine with intent to distribute, we consider the validity of a multijurisdictional narcotics enforcement agreement, the admissibility of an arresting officer's employment records, and the circumstances under which a trial judge must charge "mere presence." We find no error and affirm.

## I. Facts and Procedural History

On March 2, 2006, officers on the Lexington County Narcotics Enforcement Team (NET) executed a search warrant for drugs at a trailer on Two Notch Road in Batesburg, South Carolina. When Agent Bill Laney and Officer Emmitt Gilliam pulled into the driveway, they saw Burgess and another individual standing by a trailer which was not the target of the search warrant. They then saw Burgess "run around the back side of the trailer and flee." Gilliam ran around the

other side of the trailer "to cut him off." Gilliam got to within five to six feet of Burgess and told him to stop and put his hands up. He then saw Burgess drop an empty pill bottle with no top. Gilliam testified "the pill bottle had crack residue in it." Laney backtracked Burgess's steps to where Burgess had been standing and located a pill bottle top and pieces of crack cocaine on the ground. Burgess denied owning or dropping the pill bottle. He was arrested and indicted for possession with intent to distribute crack cocaine in violation of South Carolina Code section 44–53–375 (Supp.2010), based on the crack found by Laney.

At the time of the arrest, Gilliam was a police officer with the Batesburg–Leesville Police Department. The arrest occurred outside of the Batesburg–Leesville town limits. However, Gilliam was acting with NET, which has jurisdiction for all of Lexington County pursuant to a Multijurisdictional Drug Enforcement Unit Agreement (NET Agreement) signed by the police chief of the Batesburg–Leesville Police Department.

Burgess alleged Gilliam lacked authority to make an arrest outside the Batesburg–Leesville town limits, and made a pretrial motion to dismiss the charge. He argued the NET agreement did not comply with the statutes authorizing such extra-territorial jurisdiction. The trial judge denied the motion because he found the agreement valid, and therefore that Gilliam had authority to make the arrest.

After the ruling on the validity of the NET agreement, but before opening statements, the State made a motion in limine to exclude Gilliam's employment records. The trial judge sustained the objection and told Burgess's counsel: "If you, depending on how the case goes, decide you want to get into that bring it to the court's attention. . . ." During Gilliam's testimony, Burgess sought to cross-examine him about why he was no longer with the NET and to introduce the employment records. The records outline three incidents, spanning from approximately March 2006 until February 16, 2007, in which Gilliam disagreed with other officers about the use of confidential informants, used profanity, and threatened to harm another officer. The judge refused to admit the records.

After the jury charge, Burgess requested the trial judge charge the jury on "mere presence." Relying on *State v.*

*Peay,* 321 S.C. 405, 410–11, 468 S.E.2d 669, 672–73 (Ct.App. 1996) and *State v. Ballenger,* 322 S.C. 196, 199–200, 470 S.E.2d 851, 854 (1996), the judge denied the request, and stated: "The State indicated that they rely only on actual possession and not constructive possession. Those cases indicate that mere presence is not required and would be improper and for that reason I did not charge that."

The jury found Burgess guilty, and the judge sentenced him to three years in prison.

## II. The Multijurisdictional Drug Enforcement Unit Agreement

In September 2001, eleven law enforcement agencies in Lexington County entered into an agreement creating the NET. The agreement states it is made pursuant to South Carolina Code sections 23–1–210 (1981) (amended 2007) and 23–1–215 (1987) (amended 2007).[1] The agreement states its purpose as follows:

[T]he parties ... consent and agree to span the geopolitical boundaries of all areas of Lexington County to the fullest extent allowed under South Carolina law for the express purpose of investigating the illegal use of controlled substances and related crimes by creating this Lexington County Multi–Agency Narcotics Enforcement Team[.]

The Batesburg–Leesville police chief signed the agreement. The State put into evidence a videotape of the August 13, 2001 Batesburg–Leesville town council meeting at which "the chief of police informed council of that pending matter between the solicitor and the town of Batesburg/Leesville forming a multi-jurisdictional agreement for continued narcotics work in Lexington County." A town council member testified the police chief had "the advice and consent to enter into this agreement of town council."

■■■■ Our analysis of Gilliam's authority to arrest Burgess begins with the premise that "[t]he jurisdiction of a municipal police officer, absent statutory authority, generally does not

---

1. These code sections have been amended. *See* S.C.Code Ann. §§ 23–1–210, –215 (Supp.2010). However, because the agreement was executed in 2001, we use the prior versions of the statutes in deciding this case.

extend beyond the territorial limits of the municipality." *State v. Harris,* 299 S.C. 157, 159, 382 S.E.2d 925, 926 (1989); *see* S.C.Code Ann. § 5-7-110 (2004) ("Any such police officers shall exercise their powers on all private and public property within the corporate limits of the municipality...."). However, there are exceptions to this general rule, including the two statutes listed as authority for creating the NET agreement: section 23-1-210, allowing the temporary transfer of an officer to another municipality or county; and section 23-1-215, providing for agreements between multiple law enforcement jurisdictions for criminal investigation.[2]

The trial judge ruled the NET agreement valid under section 23-1-210, which provides in part:

(A) Any municipal or county law enforcement officer may be transferred on a temporary basis to work in law enforcement[3] in any other municipality or county in this State under the conditions set forth in this section, and when so transferred shall have all powers and authority of a law enforcement officer employed by the jurisdiction to which he is transferred.

(B) Prior to any transfer as authorized in subsection (A), the concerned municipalities or counties shall enter into written agreements stating the conditions and terms of the temporary employment of officers to be transferred. The bond for any officer transferred shall include coverage for his activity in the municipality or county to which he is transferred in the same manner and to the same extent provided by bonds of regularly employed officers of that municipality or county.

---

2. There are other instances of extra-territorial jurisdiction which are inapplicable to this case. *See, e.g.,* S.C.Code Ann. § 5-7-120 (2004) (requesting help from other subdivisions in emergency situations); S.C.Code Ann. § 17-13-40 (2003) (extending authority to three-mile radius outside town limits or an adjacent county if an officer is in pursuit of one who violated an ordinance or statute within the officer's jurisdiction); S.C.Code Ann. § 17-13-45 (2003) (responding to a distress call or request for assistance in an adjacent jurisdiction).

3. The 2007 amendment to this section includes the phrase "within multijurisdictional task forces established for the mutual aid and benefit of the participating jurisdictions, or...."

(C) Agreements made pursuant to subsection (B) shall provide that temporary transfers shall in no manner affect or reduce the compensation ... of transferred officers and such officers shall continue to be paid by the county or municipality where they are permanently employed....

The judge found the NET Agreement complied with section 23-1-210 because "there is nothing in here ... that would prohibit either a county or a municipality or a town from authorizing in some way the chief of police or the sheriff to enter into such agreements."

 An action involving the interpretation of a statute is an action at law, which we review de novo. *Town of Summerville v. City of North Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008). We agree with the trial judge that the NET agreement meets the requirements of section 23-1-210. First, the concerned municipalities and county entered into a written agreement to create multijurisdictional law enforcement authority. Second, the agreement complies with the requirements of 23-1-210, such as stating the employment conditions and maintaining compensation from permanent employment. Finally, the officers acting with the NET were transferred to it on a temporary basis.

Nevertheless, Burgess argues the agreement fails to provide jurisdiction under 23-1-210 for two reasons. First, Burgess argues "Gilliam was not temporarily transferred but rather he was involved in an investigation focused on a case and location." We disagree. Even if Gilliam had been transferred for only this one investigation, it was still a temporary transfer. Second, Burgess argues the Batesburg–Leesville police chief who signed the agreement lacked the authority to enter into it under section 23-1-210. We agree with the trial judge's determination that nothing in the statute "would prohibit either a county or a municipality or a town from authorizing in some way the chief of police or the sheriff to enter into such agreements." The Batesburg/Leesville police chief informed the town council of the agreement *before its execution,* and the council gave him the authority to enter into it.

The supreme court's recent opinion in *State v. Boswell,* 391 S.C. 592, 707 S.E.2d 265 (2011), does not change this analysis. In *Boswell,* the court applied section 23-20-50(A) of the South

Carolina Code (2007) to a multijurisdictional agreement entered into between the Calhoun County and Lexington County Sheriffs' Departments pursuant to the Law Enforcement Assistance and Support Act.[4] *Id.* at 601–03, 707 S.E.2d at 270–71. The court held the agreement was invalid because it was "not voted on by the county council" as required by section 23–20–50(A) of the Act. *Id.* at 602, 707 S.E.2d at 270.

Burgess did not argue to the trial court and does not argue on appeal that section 23–20–50(A) applies to the NET agreement in this case. In any event, we find *Boswell* distinguishable because the NET agreement here was not entered pursuant to the Law Enforcement Assistance and Support Act. Therefore, section 23–20–50(A) of the Act does not apply. By its own terms, the section applies to "[a]n agreement entered into ... pursuant to this chapter. ..." § 23–20–50(A) (emphasis added).[5] Section 23–20–30(B) specifically provides that the Act does not "alter, amend, or affect any rights, duties, or responsibilities of law enforcement authorities established by South Carolina's ... statutory laws ... except as expressly provided for in this chapter." The NET agreement here was made pursuant to section 23–1–210, part of a different chapter from the Law Enforcement Assistance and Support Act entitled "General Provisions." The NET agreement does not mention the Act or section 23–20–50. We find that the requirements of section 23–20–50(A) do not apply to the NET agreement.

Accordingly, we find the agreement is valid under section 23–1–210 and conferred upon Gilliam the authority to arrest Burgess outside of the Batesburg–Leesville town limits. Because we find the agreement valid under section 23–1–210, we

---

4. S.C.Code Ann. §§ 23–20–10 to –60 (2007).

5. Section 23–1–210 and the NET agreement in this case authorize the temporary transfer of a law enforcement officer under different circumstances from the "public safety functions" contemplated by the Law Enforcement Assistance and Support Act. The Act allows law enforcement agencies to enter agreements, such as the one in *Boswell*, "as may be necessary for the proper and prudent exercise of public safety functions." § 23–20–30(A). The section defines "public safety functions" to "include traditional public safety activities which are performed over a specified time period for patrol services, crowd control and traffic control, and other emergency service situations." *Id.*

do not address whether it meets the requirements of section 23–1–215. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (recognizing that an appellate court need not address remaining issues when resolution of one issue is dispositive).

### III. Cross–Examination on Employment Records

■ Burgess sought to introduce portions of Gilliam's employment records as "evidence of bias and motive to misrepresent" pursuant to Rule 608(c), SCRE. The judge sustained the State's objection and refused to admit the records. On appeal, Burgess argues the records "portray Gilliam as an overzealous narcotics officer who was willing to use unreliable confidential informants in order to make an arrest and who violated protocols of the NET concerning the use of confidential informants." The records include a summary of three incidents concerning Gilliam. First, in approximately March 2006, shortly after Burgess's arrest, a superior told Gilliam he did not think the NET should use a particular confidential informant. Gilliam "got upset, jumped out of his chair and went upstairs saying that he was going back to Batesburg and would not be coming back to NET." Second, in approximately October 2006, Gilliam's partner requested to be transferred away from him due to disagreements and his "bad attitude." Third, in February 2007, Gilliam used profanity and threatened another officer over a disagreement about a controlled drug buy, and then he drove off with the confidential informant in his car, in violation of NET protocol. In March 2007, the Batesburg–Leesville Police Department formally disciplined Gilliam with a two-day suspension, a ninety-day probationary period, and a demotion to the rank of Corporal.

Evidence of bias is governed by Rule 608(c), SCRE, which states: "Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Our courts have held that "anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded to his or her testimony." *State v. Baker*, 390 S.C. 56, 66, 700 S.E.2d 440, 444 (Ct.App.2010) (citing *State v. Jones*, 343 S.C. 562, 570, 541 S.E.2d 813, 817 (2001) (applying this

rule of evidence to bias under Rule 608(c), SCRE)). In excluding the evidence in this case, the judge stated: "It is irrelevant and highly prejudicial and I don't think it is relevant to any of the issues in this case at least at this point in time." Although the judge did not use the language of *Baker* and *Jones* in his ruling, we interpret the ruling as a finding that the records did not have a legitimate tendency to show bias on the part of the officer. Each incident in the records occurred after Burgess's arrest, and none of them relate directly to Burgess. Though Burgess argues the incidents relate to Gilliam's use of confidential informants, the arrest of Burgess had nothing to do with confidential informants. Gilliam detained Burgess because he fled from police during the execution of a search warrant, and arrested him because the officers determined he dropped crack cocaine as he fled. While the incidents might show Gilliam to be hot-tempered and uncooperative with other officers, they do not show his bias against Burgess, or otherwise relate to Gilliam's credibility. Under these circumstances, we find the judge's decision to exclude the evidence was within his discretion. *See Baker*, 390 S.C. at 65, 700 S.E.2d at 444 ("The admission of evidence rests in the sound discretion of the trial court. The trial court's decision will not be overturned unless controlled by an error of law resulting in undue prejudice." (citing *State v. Johnson*, 318 S.C. 194, 196, 456 S.E.2d 442, 443 (Ct.App.1995))).

## IV. Mere Presence Jury Charge

The judge charged the jury as follows:

In this case, the State is charging the defendant with actual possession of a controlled substance[;] actual possession of a controlled substance exist[s] when the controlled substance is found in the actual physical custody of the person charged with possession. Circumstantial evidence may be used to prove actual possession, but actual possession must be proven beyond a reasonable doubt. It must be shown that the defendant has possession of the controlled substance and that the defendant knew that he had the controlled substance in his possession.... Again, in this case the State has charged and must prove actual possession of crack cocaine as I have defined that term for you.

Burgess's counsel objected to the charge, stating: "I guess ... I should go ahead and except to the mere presence, the

failure to charge mere presence but I understand the court's ruling."[6] We find no error.

 "In criminal cases, the appellate court sits to review errors of law only. A trial court's decision regarding jury charges will not be reversed where the charges, as a whole, properly charged the law to be applied." *State v. Wharton,* 381 S.C. 209, 213, 672 S.E.2d 786, 788 (2009) (internal citations omitted). The law to be charged to the jury is determined from the evidence presented at trial. *State v. Davis,* 374 S.C. 581, 585, 649 S.E.2d 132, 134 (Ct.App.2007).

Our supreme court "has held mere presence instructions are required where the evidence presented at trial reasonably supports the conclusion that the defendant was merely present at the scene where drugs were found, but it was questionable whether the defendant had a right to exercise dominion and control over them." *State v. Lee,* 298 S.C. 362, 364–65, 380 S.E.2d 834, 836 (1989). This court addressed the necessity of a mere presence charge in *Peay,* 321 S.C. at 411, 468 S.E.2d at 673. The State had presented evidence that the defendant put a bag of cocaine down his pants when he bought it from an informant. 321 S.C. at 410, 468 S.E.2d at 672. When he was arrested, however, the bag of cocaine was on the front seat of the car in which he had been riding. *Id.* This court determined that "[b]ecause the evidence the [S]tate produced tended to show Peay had actual control over the cocaine, a charge distinguishing actual and constructive possession was unnecessary." 321 S.C. at 411, 468 S.E.2d at 673 (finding "the trial judge did not err in refusing Peay's request to charge constructive possession or mere presence").

 Burgess argues his case is distinguishable from *Peay* because "[n]one of the officers in the present case can testify that Burgess actually possessed the crack cocaine found on the ground." We disagree. The State's theory of the case depended on Burgess's actual possession of the crack. The State presented evidence that Gilliam saw Burgess drop the

---

6. A mere presence jury charge would have instructed the jury that a defendant cannot be found guilty of possession of narcotics simply because he was present at the scene where the narcotics were found. *State v. Robinson,* 306 S.C. 399, 401 n. 1, 412 S.E.2d 411, 413 n. 1 (1991).

bottle with crack cocaine residue, and that both the top to the bottle and the crack pieces were found in Burgess's flight path. This evidence indicated Burgess had actual possession of the cocaine. Moreover, the jury charge limited the State to proving actual possession and gave the jury no option to find constructive possession. When constructive possession is not an issue in the case, it is not necessary to explain the concept of mere presence in the jury charge. In drug possession cases, the concept of mere presence relates exclusively to constructive possession, not actual possession. *State v. James*, 386 S.C. 650, 654–55, 689 S.E.2d 643, 646 (Ct.App.2010) (noting " 'a charge on mere presence is necessary only when the [S]tate attempts to establish constructive possession of contraband' " (quoting *Peay*, 321 S.C. at 411, 468 S.E.2d at 673)). Therefore, in this case it was unnecessary for the judge to charge mere presence.

## V. Conclusion

We affirm the trial judge's decision that Gilliam had jurisdiction to arrest Burgess because the multijurisdictional agreement was valid under section 23–1–210. We also affirm the trial judge's exclusion of Gilliam's employment records and his decision not to charge mere presence to the jury.

**AFFIRMED.**

SHORT and WILLIAMS, JJ., concur.