# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Lawrence Burgess, Petitioner.

Appellate Case No. 2011-194288

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Lexington County
James W. Johnson, Jr., Circuit Court Judge

---

Opinion No. 27405
Heard October 16, 2013 – Filed July 2, 2014

---

## AFFIRMED AS MODIFIED

---

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Deputy Attorney General Deborah R.J. Shupe, all of Columbia; Solicitor Donald V. Myers, of Lexington, for Respondent.

---

**JUSTICE BEATTY:** Lawrence Burgess was convicted of possession of crack cocaine with intent to distribute and sentenced to three years in prison and ordered to pay a $25,000 fine. The Court of Appeals affirmed. *State v. Burgess*,

393 S.C. 396, 712 S.E.2d 1 (Ct. App. 2011). Following the denial of his petition for rehearing, Burgess petitioned this Court for a writ of certiorari to review the decision. We granted the petition to analyze whether: (1) the multi-jurisdictional drug-enforcement agreement, which formed the purported basis of the arresting officer's authority to arrest Burgess outside of the officer's territorial jurisdiction, satisfied the statutory prerequisites to constitute a valid agreement; and (2) Burgess should have been permitted to cross-examine the arresting officer with his personnel records pursuant to Rule 608(c) of the South Carolina Rules of Evidence. Although we find the Court of Appeals correctly affirmed Burgess's conviction, we disagree with the court's conclusion regarding the multi-jurisdictional drug-enforcement agreement. Accordingly, we affirm as modified.

## I. Factual / Procedural History

On March 2, 2006, officers with the Lexington County Narcotics Enforcement Team (NET) executed a search warrant for a trailer at 7120 Two Notch Road in Batesburg, South Carolina, which had been the site of several controlled drug buys. When Agent Billy Laney of the Lexington County Sheriff's Department and Officer Emmitt Gilliam of the Batesburg-Leesville Police Department pulled into the driveway, they saw Burgess and another individual standing by a trailer that was not the target of the search warrant. The officers then witnessed Burgess run around the back of the trailer. Officer Gilliam ran around the other side of the trailer "to cut him off." When Officer Gilliam got within five to six feet of Burgess, he commanded him to stop and put his hands up. Officer Gilliam placed Burgess under arrest and handcuffed him with the assistance of Agent Eric Kirkland of the Lexington County Sheriff's Department. Agent Laney "backtracked" Burgess's steps to where Burgess had been standing and discovered a pill bottle top and pieces of crack cocaine on the ground. The substance found on the ground was chemically tested and determined to be 5.67 grams of crack cocaine. As a result, a Lexington County grand jury indicted Burgess for possession of crack cocaine with intent to distribute.

In a pre-trial hearing, Burgess moved to dismiss the charge for lack of jurisdiction. Burgess asserted that Officer Gilliam lacked authority to arrest Burgess in an area outside the officer's territorial jurisdiction of the Batesburg-Leesville town limits. Although the State maintained that the Lexington County Multi-Agency Narcotics Enforcement Team Agreement (NET Agreement) conferred authority for extra-territorial jurisdiction, Burgess disputed its validity on

the ground it failed to comply with the statutory prerequisites of sections 23-1-210[1] and 23-1-215[2] of the South Carolina Code.

---

[1] At the time of the agreement's execution, section 23-1-210 provided in relevant part:

> (A) Any municipal or county law enforcement officer *may be transferred on a temporary basis to work in law enforcement in any other municipality or county* in this State under the conditions set forth in this section, and when so transferred shall have all powers and authority of a law enforcement officer employed by the jurisdiction to which he is transferred.
>
> (B) Prior to any transfer as authorized in subsection (A), *the concerned municipalities or counties shall enter into written agreements* stating the conditions and terms of the temporary employment of officers to be transferred. The bond for any officer transferred shall include coverage for his activity in the municipality or county to which he is transferred in the same manner and to the same extent provided by bonds of regularly employed officers of that municipality or county.

S.C. Code Ann. § 23-1-210 (2007) (emphasis added). In 2007, subsection (A) was amended to provide that "[a]ny municipal or county law enforcement officer may be transferred or assigned on a temporary basis to work in law enforcement within *multijurisdictional task forces established for the mutual aid and benefit of the participating jurisdictions*." Act No. 3, 2007 S.C. Acts 4 (emphasis added).

[2] Section 23-1-215 provided in relevant part:

> (A) In the event of a crime where multiple jurisdictions, either county or municipal, are involved, *law enforcement officers are authorized to exercise jurisdiction within other counties or municipalities for the purpose of criminal investigation only if a written agreement between or among the law enforcement agencies involved has been executed*. This limitation on law enforcement activity shall not apply to any activity authorized by § 17-13-40.
>
> (B) Any law enforcement officer working under this agreement is vested with equal authority and jurisdiction outside his resident

Initially, Burgess argued that section 23-1-215 was the controlling statute because it provides authority for the institution of "agreements between multiple law enforcement jurisdictions."  Because the governing bodies of Batesburg-Leesville and Lexington County were not provided written notice of the NET Agreement's execution as required by subsection (E) of section 23-1-215, Burgess claimed the agreement was invalid.  Additionally, Burgess asserted that section 23-1-210 did not apply to the NET Agreement as that section is limited "to the temporary transfer of an officer."  In the alternative, he argued that the agreement did not comply with section 23-1-210 because it was executed by law enforcement officers and not by "council members."

In response to Burgess's motion, the State presented a copy of the NET Agreement that was entered into by eleven law enforcement agencies in Lexington County[3] on September 18, 2001.[4]  The NET Agreement, which referenced sections 23-1-210 and 23-1-215,[5] stated in relevant part:

---

> jurisdiction for the purpose of investigation, arrest, or any other activity related to the criminal activity for which the agreement was drawn.
>
> . . . .
>
> (E)  The respective governing bodies of the political subdivisions, wherein each of the law enforcement agencies entering into the agreement authorized in subsection (A) is located, must be notified by its agency of the agreement's execution and termination. *The notification must be in writing and accomplished within seventy-two hours of the agreement's execution and within seventy-two hours of the agreement's termination.*

S.C. Code Ann. § 23-1-215 (2007) (emphasis added).  In 2007, this code section was amended.  Act No. 3, 2007 S.C. Acts 5.  This amendment, however, does not affect the disposition of this case.

[3]  The agencies included Batesburg-Leesville Police Department, Cayce Department of Public Safety, Chapin Police Department, Columbia Metropolitan Airport Police Department, Gaston Police Department, Irmo Police Department, Lexington County Sheriff's Department, Pine Ridge Police Department, South Congaree Police Department, Springdale Police Department, and West Columbia Police Department.

WHEREAS, it is the desire and intent of the parties to evidence their joint undertaking for the provision of mutual assistance in criminal narcotics investigations by the creation and operation of a multijurisdictional task force within Lexington County.

WHEREAS, the parties as set out above, by and through their representatives affixing their signatures below, consent and agree to span the geopolitical boundaries of all areas of Lexington County to the fullest extent allowed under South Carolina law for the express purpose of investigating the illegal use of controlled substances and related crimes by creating this Lexington County Multi-Agency Narcotics Enforcement Team [.]

. . . .

1. SCOPE OF SERVICES

It is agreed that the law enforcement agency parties shall assign, on a temporary basis, officers to participate in the Lexington County Multijurisdictional Drug Enforcement Unit for the duration of this agreement or until this agreement is rescinded as set forth herein.

2. TERM AND RENEWAL

This agreement is effective as to each party at the date and time of signing and will automatically renew one year from the above date unless a party exercises its right to terminate as further described herein.

---

[4] The NET Agreement was amended in May 2002 and July 2005 to add other law enforcement agencies; however, the substantive provisions of the agreement remained the same.

[5] The NET Agreement also referenced Article VIII, Section 13 of the South Carolina Constitution and section 17-13-45 of the South Carolina Code. These sections, however, are not at issue in the instant case. *See* S.C. Const. art. VIII, § 13 (authorizing joint administration of functions and exercise of powers among counties, municipalities, or other political subdivisions of the State); S.C. Code Ann. § 17-13-45 (2003) (providing authority for law enforcement responding to distress call or request for assistant in an adjacent jurisdiction).

3.  VESTING OF AUTHORITY AND JURISDICTION

To the fullest extent permitted by the Constitution and statutes of this State, officers assigned under this agreement and so transferred shall be vested with authority, jurisdiction, rights, immunities, and privileges to include the authority to execute criminal process and the power of arrest as any other duly commissioned officer of any other party.

. . . .

10.  RESPONSIBILITY TO RESPECTIVE GOVERNING BODIES

Each party is responsible for any notice, reporting, or approval requirements to their respective governing body as may be required under South Carolina law.

11.  OFFICERS ASSIGNED

Each party agrees to designate and transmit in writing, the names of those individuals assigned to perform duties under this agreement to the other parties.  Upon receipt, such is to be made a part of and is incorporated by reference into this agreement.

In explaining the agreement, the State showed that it was signed by Chief Wallace Oswald on behalf of the Town of Batesburg-Leesville.  According to the State, Chief Oswald entered into the NET Agreement based on the advice and consent of the Batesburg-Leesville Town Council (Town Council).  The State introduced a videotape of an August 31, 2001 Town Council meeting during which Chief Oswald informed Town Council of "that pending matter between the solicitor and the town of Batesburg[-]Leesville forming a multi-jurisdictional agreement for continued narcotics work in Lexington County."

The State also introduced minutes from the January 8 and December 10, 2002, Lexington County Council (County Council) meetings through the Clerk of the County Council.  The January 8 minutes show County Council considered grant application requests from the sheriff's department for a NET.  The December 10 minutes reflect that County Council voted in favor of grant requests regarding additional staff positions in both the solicitor's and sheriff's office to focus on the NET.

In conjunction with the minutes, the State presented testimony from Marguerite Crapps, the mayor pro tem of the Batesburg-Leesville Town Council. When asked whether the Batesburg-Leesville Town Council was "on board with the chief of police [to] enter into this agreement on the behalf of Town Council of Batesburg-Leesville," Crapps responded, "Yes."

Lieutenant Byron Snellgrove, who was employed with the narcotics unit of the Lexington County Sheriff's Department, was the NET supervisor at all times relevant to this case. Lieutenant Snellgrove testified Chief Oswald and the Town of Batesburg-Leesville assigned Officer Gilliam, of the Batesburg-Leesville Police Department, to the NET. He then assigned Officer Gilliam to the Batesburg-Leesville area of Lexington County "to take care of cases inside the town limits as well as outside the town limits." After Officer Gilliam advised Lieutenant Snellgove that "there were drug [sales] going on at 7120 Two Notch Road," Lieutenant Snellgrove asked Gilliam "to try to make a case or get into that location one way or another." Lieutenant Snellgrove then requested that Officer Gilliam help with the drug problem at that location pursuant to the NET Agreement.

Based on this evidence, the State contended that the notice requirement of section 23-1-215 was met because both County Council and Town Council had actual notice of the NET Agreement and approved their respective law enforcement agencies' participation in the NET. In contrast to the defense, the State believed the notice provision of section 23-1-215 was "purely ministerial and administrative," similar to the ten-day notice requirement for the return of a search warrant to the magistrate upon the execution of the search warrant. Thus, the State asserted that section 23-1-215(E) should not be "strictly construed" to require written notice.

Additionally, the State maintained the NET Agreement satisfied the provisions of section 23-1-210. Because the governing bodies had actual notice of the NET Agreement and its terms, the State claimed that chief law enforcement officers were authorized to enter into these agreements "with the advice and consent of county council." The State explained that Chief Oswald "acting as agent for the corporate municipality of Batesburg[-]Leesville [had] apparent authority to bind them . . . because he had the total responsibility of law enforcement within that town."

After hearing arguments, the trial judge found the State failed to present evidence that written notification had been given within 72 hours of the agreement's execution as required by section 23-1-215(E). The judge, however,

ruled that the NET Agreement complied with section 23-1-210 because he found nothing in the statute "that would prohibit either a county or a municipality . . . from authorizing in some way the chief of police or the sheriff to enter into such agreements." Although the judge was unclear as to which code section the NET Agreement was based, he concluded the agreement was created pursuant to section 23-1-210. As a result, the judge denied Burgess's motion to dismiss.

Subsequently, the State made a motion *in limine* to exclude Officer Gilliam's personnel records. The judge sustained the State's motion, but indicated that he would consider the motion if Burgess "wanted to get into" these records.

During Officer Gilliam's testimony, Burgess sought to cross-examine him about why he was no longer with NET and to introduce his personnel records. The records, which describe three incidents that took place after Burgess's arrest but before trial, involved a disagreement with other officers about the use of confidential informants, his use of profanity, and his threat to harm another officer. The incidents resulted in a two-day suspension, a demotion to the rank of Corporal, and a ninety-day period of probation. The judge excluded the records, finding the personnel matters were irrelevant and highly prejudicial.

Ultimately, the jury found Burgess guilty of possession of crack cocaine with intent to distribute. Burgess appealed his conviction to the Court of Appeals, which affirmed. *State v. Burgess*, 393 S.C. 396, 712 S.E.2d 1 (Ct. App. 2011). In so ruling, the court upheld the trial judge's decision that the NET Agreement complied with the requirements of section 23-1-210. *Id.* at 402, 712 S.E.2d at 4. Specifically, the court found: (1) the concerned municipalities and county entered into a written agreement to create multi-jurisdictional law enforcement authority; (2) the agreement complied with the requirements of section 23-1-210 by stating the employment conditions and maintaining compensation from permanent employment; and (3) the officers acting with the NET were transferred to it on a temporary basis. *Id.* The court further found Chief Oswald informed Town Council of the NET Agreement before its execution, and Town Council gave him the authority to enter into the agreement. *Id.*

Additionally, the court distinguished the case from *State v. Boswell*, 391 S.C. 592, 707 S.E.2d 265 (2011), which was decided by this Court during the pendency of Burgess's appeal.[6] The Court of Appeals found *Boswell* inapposite as

---

[6] In *Boswell*, the defendant was convicted of first-degree burglary. *Boswell*, 391 S.C. at 594, 707 S.E.2d at 265. On appeal, Boswell argued, among other issues,

the NET Agreement was not entered pursuant to the Law Enforcement Assistance and Support Act and, thus, section 23-20-50(A) of the Act did not apply. *Burgess*, 393 S.C. at 403, 712 S.E.2d at 4-5. Rather, the court found the NET Agreement was "made pursuant to section 23-1-210, part of a different chapter from the Law Enforcement Assistance and Support Act entitled 'General Provisions.' " *Id.*

Having found the NET Agreement was valid pursuant to section 23-1-210, the court declined to address its validity under section 23-1-215. *Id.* at 403-04, 712 S.E.2d at 5.

As to the judge's ruling regarding the admission of Officer Gilliam's personnel records, the Court of Appeals found the trial judge did not abuse his discretion in excluding these records. *Id.* at 404-05, 712 S.E.2d at 5. In so ruling, the court interpreted the judge's decision "as a finding that the records did not have a legitimate tendency to show bias on the part of the officer." *Id.* at 405, 712 S.E.2d at 5. The court noted that each incident in Officer Gilliam's personnel records occurred after Burgess's arrest and none of the incidents related directly to Burgess. *Id.* Additionally, the court concluded that while the personnel incidents "might show Gilliam to be hot-tempered and uncooperative with other officers, they do not show his bias against Burgess, or otherwise relate to Gilliam's credibility." *Id.*

Burgess petitioned this Court for a writ of certiorari to review the decision of the Court of Appeals. This Court granted the petition.

---

that the trial judge erred in declining to suppress his confessions as they were the direct result of an unlawful arrest by officers acting outside their territorial jurisdiction. *Id.* at 594, 707 S.E.2d at 266. Specifically, Boswell contended the Lexington County officers were without authority to arrest him for a crime that occurred in Calhoun County. *Id.* at 598, 707 S.E.2d at 268. The State offered evidence of a 1999 multi-jurisdictional agreement entered into between the Calhoun County and Lexington County Sheriff's Departments that purported to confer the authority of officers to arrest in the other county's jurisdiction. *Id.* In assessing the validity of the agreement, this Court applied section 23-20-50(A) of the Law Enforcement Assistance and Support Act. *Id.* at 601, 707 S.E.2d at 270. Because the agreement was "not voted on by the county council" as required by section 23-20-50(A) of the Act, this Court deemed it invalid. *Id.* at 602, 707 S.E.2d at 270.

## II.    Discussion

## A.    Multi-Jurisdictional Agreement

In advocating the reversal of the decision of the Court of Appeals, Burgess posits three arguments.  First, he contends that *Boswell* is dispositive as he broadly construes the holding to require all multi-jurisdictional agreements to be voted on by the governing body of each jurisdiction pursuant to section 23-20-50(A).  Second, he asserts the agreement failed to strictly comply with the provisions of section 23-1-210 as the "State presented no written verification that the Batesburg/Leesville town council authorized the Chief of Police to entered into the agreement [on] behalf of the council."  Burgess further notes that "there is no mention of the County authorizing Sheriff Metts to enter into the agreement on behalf of the County."  Finally, Burgess maintains that it is "questionable" whether section 23-1-215 is applicable to the facts of the instant case as he believes this code section only applies to situations where a crime has occurred in multiple jurisdictions.[7]  Even if applicable, Burgess avers that law enforcement failed to comply with the statutorily required written notice provision of subsection (E).  Because the validity of a multi-jurisdictional agreement is dependent upon strict compliance, he disputes the State's contention that actual notice is sufficient.

### 1. Implications of *Boswell*

We agree with the Court of Appeals that *Boswell* is not controlling as it is factually and legally distinguishable.  However, as will be discussed, we find the interpretation of *Boswell* by the Court of Appeals was entirely too narrow.

---

[7]  As a threshold matter, Burgess asserts that any argument regarding the applicability of section 23-1-215 is not preserved for appellate review because the State did not appeal the trial judge's decision as to this statute and raised it for the first time in its final brief to the Court of Appeals and in its return to Burgess's petition for a writ of certiorari.  We find the issue is properly before this Court because the State challenged the trial judge's ruling on this issue as an additional sustaining ground to the Court of Appeals and to this Court.  *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("The appellate court may review respondent's additional reasons and, if convinced it is proper and fair to do so, rely on them or any other reason appearing in the record to affirm the lower court's judgment.").

Initially, we note that Burgess did not argue to the trial judge or to the Court of Appeals that section 23-20-50(A) was applicable; therefore, any argument regarding this statute is not preserved for appellate review. *See State v. Sheppard*, 391 S.C. 415, 706 S.E.2d 16 (2011) (stating that an issue may not be raised for the first time on appeal). Furthermore, unlike the agreement in *Boswell*, the NET agreement in the instant case does not reference section 23-20-50 or contain a provision outlining the public safety situations identified in section 23-20-30.[8] Thus, we agree with the ultimate conclusion reached by the Court of Appeals regarding the inapplicability of *Boswell*.

However, we find the court interpreted *Boswell* too narrowly as it infers that section 23-20-50(A) either conflicts with or is mutually exclusive from sections 23-1-210 and 23-1-215. This is an incorrect reading of *Boswell*. Because all of these code sections are contained within Title 23, which is entitled "Law Enforcement and Public Safety," these sections cannot be read in isolation as the Court of Appeals appears to have done. *See Higgins v. State*, 307 S.C. 446, 415 S.E.2d 799 (1992) (recognizing rule of statutory construction that statutes must be read as a whole and sections which are part of the same general statutory scheme must be construed together and each given effect, if it can be done by any reasonable construction).

Although we question why the General Assembly has failed to consolidate these sections into one that would govern all multi-jurisdictional agreements, we believe the separate sections were enacted as a result of legislative progression. Specifically, section 23-1-210 was enacted in 1981 to address the temporary transfer of law enforcement officers to another jurisdiction, section 23-1-215 was enacted in 1987 to expressly address crimes that occur in multiple jurisdictions, and section 23-20-50 was enacted in 2000 to authorize law enforcement to assist other jurisdictions with certain public safety concerns.[9] Notably, the drafters of these agreements appear to recognize this interrelationship as the agreements usually include a reference to all of these sections.

---

[8] The agreement in *Boswell* implicitly included section 23-20-50 as it notes that one of the purposes of the agreement is to "provide mutual aid in the event of natural disaster, disorder, or other emergency situations." It also expressly provided that the agreement does not affect any agreements regarding narcotics investigations.

[9] Act No. 109, 1981 S.C. Acts 402; Act No. 107, 1987 S.C. Acts 262; Act No. 382, 2000 S.C. Acts 2604.

## 2. Propriety of NET Agreement under sections 23-1-210 and 23-1-215

Even though *Boswell* is not dispositive of the instant case, it is nonetheless instructive because it stands for the proposition that statutes governing multi-jurisdictional agreements must be strictly complied with to ensure the validity of the agreement. *See Boswell*, 391 S.C. at 602, 707 S.E.2d at 270 (recognizing the significance of territorial jurisdiction and concluding that a "more stringent approach needs to be followed in order to confer this type of authority"). Applying this principle to the instant case, we hold the NET Agreement is invalid as it does not satisfy the statutory requirements of either section 23-1-210 or section 23-1-215.

### a. Section 23-1-210

As a matter of state statute, the Town of Batesburg-Leesville and Lexington County operate and govern through Town Council and County Council. *See* S.C. Code Ann. § 4-9-30(3), (13) (1986 & Supp. 2013) ("[E]ach county government within the authority granted by the Constitution and subject to the general law of this State shall have the following enumerated powers which shall be exercised by the respective governing bodies thereof:  (3) to make and execute contracts . . . (13) to participate in multi-county projects and programs authorized by the general law and appropriate funds therefor . . . ."); S.C. Code Ann. § 5-7-160 (2004) ("All powers of the municipality are vested in the council, *except* as otherwise provided by law, and the council shall provide for the exercise thereof and for the performance of all duties and obligations imposed on the municipality by law." (emphasis added)).

Consistent with this general authorization of power, subsection (B) of section 23-1-210 mandates that "the concerned municipalities or counties" enter into written agreements providing for the transfer of its law enforcement officers to another municipality or county.  S.C. Code Ann. § 23-1-210(B) (2007).  Certainly, there is evidence that County Council approved grant requests to fund additional staff positions associated with NET and Town Council was verbally informed of the "pending matter between the solicitor and the town of Batesburg[-] Leesville forming a multi-jurisdictional agreement."  These procedures, however, did not constitute express approval by "the concerned municipalities or counties" as to the actual NET Agreement.  In fact, the record reveals that the terms of the NET Agreement were never presented to the governing bodies for their approval. Instead, the only evidence is that Chief Oswald and Sheriff Metts entered into the

NET Agreement on behalf of their law enforcement agencies. Thus, without the express approval of Town Council and County Council, the NET Agreement failed to strictly comply with the statutory requirements of section 23-1-210.

Notwithstanding the lack of strict statutory compliance, the State contends the agreement is, nevertheless, valid as the governing entities provided Chief Oswald and Sheriff Metts with apparent authority to enter into the NET Agreement. We reject this contention as Town Council and County Council could not delegate this authority.

Because the authority to enter into these agreements was statutorily conferred upon the governing entities, these entities were prohibited from abdicating this power and delegating it to a law enforcement officer. *See* 2A Eugene McQuillin, *The Law of Municipal Corporations* § 10:46 (3d ed. 1996) ("Usually a power conferred without limitation upon the municipal corporation may be exercised by the common council or legislative body as the general agent of the corporation, and by no other authority. A fortiori, power conferred upon the council or legislative body in express terms cannot be delegated otherwise than in accordance with the expression of terms." (footnotes omitted)); 62 C.J.S. *Municipal Corporations* § 206 (Supp. 2013) ("The governing body of a municipal corporation, entrusted by the state with the police power, is prevented from delegating its high functions to any body or officer; instead, it may be discharged or exercised only by those to whom the state commits it." (footnotes omitted)); *see also Newman v. McCullough*, 212 S.C. 17, 25-26, 46 S.E.2d 252, 256 (1948) (recognizing that a municipal council, "acting as a governmental agency, . . . is bound always to act as trustee of the power delegated to it and may not surrender or restrict any portion of such power conferred upon it").

Thus, strictly construing section 23-1-210, we are constrained to find the NET Agreement was invalid as Town Council and County Council were the only entities authorized to enter into this multi-jurisdictional agreement. If law enforcement agencies are to have this authority, it is for the General Assembly and not this Court to grant them this authority. *See* 80 C.J.S. *Sheriffs & Constables* § 51 (Supp. 2013) ("Sheriffs and constables have all the powers and duties appertaining to their office at common law except as modified by a statute or the state constitution.").[10]

---

[10] Even assuming Chief Oswald was authorized to enter into the NET Agreement on behalf of the Town of Batesburg-Leesville, we find Officer Gilliam was not "transferred on a temporary basis to work in law enforcement in any other

### b. Section 23-1-215

Although not addressed by the Court of Appeals, we find the trial judge correctly ruled the NET Agreement did not comply with the provisions of section 23-1-215 as the State presented no evidence that County Council or Town Council received written notification within seventy-two hours of the execution of the NET Agreement as required by subsection (E). S.C. Code Ann. § 23-1-215(E) (2007).

Furthermore, it is arguable that section 23-1-215 was factually inapplicable as one could construe this section to govern only the investigation of past crimes rather than to provide blanket extra-territorial jurisdiction to officers addressing potential criminal activity. As titled, the purpose of section 23-1-215 is to authorize "[a]greements between multiple law enforcement jurisdictions for purpose of criminal investigation." *Id.* § 23-1-215. Subsection (A) then states in the past tense, "[i]n the event of a crime" involving multiple jurisdictions;[11] thus, by implication, the statute authorizes agreements for the investigation of completed crimes spanning multiple jurisdictions.

In the instant case, Officer Gilliam was assigned to assist in the execution of a search warrant for a specific trailer at 7120 Two Notch Road. Because Burgess was not the subject of this investigation as he did not reside at this trailer and was arrested near a trailer that was not the target of the search warrant, we do not

---

municipality or county in this State." *Id.* § 23-1-210(A). Notably, the agreement was executed in September 2001 and the arrest occurred in March 2006. There is also evidence that Officer Gilliam worked on NET for at least a year and a half. Thus, although he may have been assigned to assist in the execution of the search warrant, Officer Gilliam had relied on the provisions of the NET Agreement to claim extra-territorial authority for an extended duration. Accordingly, even though "temporary" is not defined by section 23-1-210, Officer Gilliam's extended service under the NET Agreement cannot be construed as a "temporary" transfer as intended by the statute. *See State v. Hudson*, 336 S.C. 237, 519 S.E.2d 577 (Ct. App. 1999) (acknowledging rule of statutory construction that when faced with an undefined statutory term, the court must interpret the term in accord with its usual and customary meaning).

[11] We note the 2007 amendment to section 23-1-215 expressly included past tense language stating, "In the event of a crime or crimes *that have occurred* . . . ." S.C. Code Ann. § 23-1-215(A) (Supp. 2013) (emphasis added).

believe section 23-1-215 could be interpreted to confer authority on Officer Gilliam to arrest Burgess.

### c.     Valid Conviction Despite Invalid Agreement

Despite our finding that the NET Agreement was invalid, we conclude that Burgess's conviction was, nevertheless, valid.  Although Officer Gilliam lacked authority to arrest Burgess, Agents Laney and Kirkland, who were authorized with territorial jurisdiction in Lexington County, played an integral role in the arrest and discovery of the drugs that formed the basis of the conviction.

Section 44-53-375(B) of the South Carolina Code creates a permissive inference that possession of one or more grams of a "cocaine base" is "prima facie evidence" of possession with intent to distribute.  S.C. Code Ann. § 44-53-375(B) (Supp. 2007).[12]  "Possession may be actual or constructive."  *State v. Ballenger*, 322 S.C. 196, 199, 470 S.E.2d 851, 854 (1996).  "Actual possession occurs when the drugs are found to be in the actual physical custody of the person charged with possession, while constructive possession occurs when the person charged with possession has dominion and control over either the drugs or the premises upon which the drugs are found."  *Id.* (citation omitted).

Here, the evidence was sufficient to prove Burgess possessed crack cocaine with intent to distribute.  Notably, Burgess fled when Agent Laney and Officer Gilliam arrived at the target location; thus, indicating consciousness of guilt.  *See State v. Walker*, 366 S.C. 643, 655, 623 S.E.2d 122, 128 (Ct. App. 2005) ("Unexplained flight is admissible as indicating consciousness of guilt, for it is not as likely that one who is blameless and conscious of that fact would flee.").  Officer Gilliam apprehended Burgess with the assistance of Agent Kirkland.  Agent Laney then independently searched for and discovered 5.67 grams of crack cocaine and a pill bottle top in the area from which Burgess fled.

Even if we assume that Burgess's arrest was invalid, such an assumption would be of no consequence to Burgess as this Court has held that "the illegality of an initial arrest did not bar the accused person's subsequent prosecution and conviction of the offense charge."  *State v. Biehl*, 271 S.C. 201, 204, 246 S.E.2d 859, 860 (1978).  The *Biehl* Court pointed out that no evidence used in Biehl's trial was acquired as a result of the arrest.  The same is true in Burgess's trial.  The

---

[12]  Because the offense occurred in March 2006, we cite to the code section in effect at that time.

recovery of the crack cocaine by Agent Laney was directly related to Burgess's conduct during his furtive flight. Burgess attempted to flee immediately when he saw the arrival of Agent Laney and Officer Gilliam. Agent Laney followed Burgess's furtive flight path and found the drugs in an area where Burgess had been standing. Thus, the crack cocaine, which formed the basis for Burgess's conviction, was not fruit of the arrest. Specifically, the drugs were not found on Burgess's person nor were they located as a result of anything Burgess said after he was arrested. Rather, the drugs were independently found by Agent Laney of the Lexington County Sheriff's Office.

Finally, Burgess's reliance on our decision in *Boswell* is unavailing. After Boswell was arrested, he confessed to the arresting officers. *Boswell*, 391 S.C. at 597, 707 S.E.2d at 267. Accordingly, we held that the confessions should have been excluded at trial as they were the fruit of the invalid arrest. *Id.* at 606, 707 S.E.2d at 272. However, in this case, Burgess did not confess nor were the drugs found on his person or his property.

In light of the foregoing, we find the invalid NET Agreement did not negate the authority of Agents Laney and Kirkland to charge Burgess with the offense for which he was convicted.

### III.    Cross-Examination

Burgess next asserts the trial judge erred in refusing to allow cross-examination about Officer Gilliam's personnel records as the records constituted evidence of bias and motive to misrepresent pursuant to Rule 608(c), SCRE.

Burgess maintains that Officer Gilliam's credibility as a witness was "a key issue at trial" because he was the only witness to testify that Burgess dropped a pill bottle that contained crack cocaine residue. Burgess also notes that neither Agent Laney nor Officer Gilliam witnessed Burgess in actual possession of the crack cocaine that was discovered on the ground. In view of this evidence, Burgess contends "the jury . . . had a right to know about Gilliam's disciplinary problems and removal from the NET because the information had a legitimate tendency to throw light on the accuracy, truthfulness and sincerity of Gilliam's testimony." Specifically, Burgess claims "[t]he records portray Gilliam as an overzealous narcotics officer who was willing to use unreliable confidential informants in order to make an arrest and who violated protocols of the NET concerning the use of confidential informants."

"Rule 608(c), SCRE, provides that bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." *State v. Sims*, 348 S.C. 16, 25, 558 S.E.2d 518, 523 (2002). "Rule 608(c) 'preserves South Carolina precedent holding that generally, anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony.' " *Id.* (*quoting State v. Jones*, 343 S.C. 562, 570, 541 S.E.2d 813, 817 (2001)).

"As a general rule, a trial court's ruling on the proper scope of cross-examination will not be disturbed absent a manifest abuse of discretion." *State v. Quattlebaum*, 338 S.C. 441, 450, 527 S.E.2d 105, 109 (2000). An abuse of discretion occurs when the trial court's ruling either lacks evidentiary support or is based on an error of law. *State v. Pagan*, 369 S.C. 201, 631 S.E.2d 262 (2006).

We find the Court of Appeals correctly upheld the trial judge's decision prohibiting Burgess from cross-examining Officer Gilliam about his personnel records as we discern no abuse of discretion. Significantly, each of the disciplinary incidents occurred after Burgess's arrest and did not involve Burgess. Furthermore, Officer Gilliam's hostile actions were directed at co-workers rather than subjects of criminal investigation. Thus, Burgess failed to offer evidence that Officer Gilliam lacked credibility due to bias against Burgess. Accordingly, the trial judge properly limited Burgess's cross-examination of Officer Gilliam. *Cf. Baldez v. State*, 386 S.W.3d 324 (Tex. Ct. App. 2012) (discussing Rule 608 and holding that trial judge did not err in prohibiting defendant from cross-examining the arresting officer concerning his disciplinary suspension for the sole purpose of showing the officer's lack of credibility as the defendant never argued that the officer was untrustworthy due to bias or interest against the defendant).

### IV.    Conclusion

Based on the foregoing, we hold the NET Agreement was invalid and, thus, did not confer extra-territorial jurisdiction upon Officer Gilliam. *See State v. Harris*, 299 S.C. 157, 159, 382 S.E.2d 925, 926 (1989) ("The jurisdiction of a municipal police officer, absent statutory authority, generally does not extend beyond the territorial limits of the municipality."). Our decision should not be construed as invalidating all multi-jurisdictional agreements. Instead, we recognize the import of these agreements and emphasize that they are not invalid per se. The validity of these agreements, however, is dependent upon strict compliance with the applicable statutes. Because the NET Agreement in the

instant case failed to satisfy the statutory requirements, we are constrained to find that it is invalid.

However, despite the invalidity of the NET Agreement, we find the Court of Appeals correctly affirmed Burgess's conviction as Officer Gilliam's lack of authority did not negate Agents Laney's and Kirkland's authority in Lexington County. Thus, Officer Gilliam's lack of authority did not vitiate the valid conviction. Moreover, we find the Court of Appeals correctly upheld the trial judge's decision prohibiting Burgess from cross-examining Officer Gilliam regarding his personnel records as we discern no abuse of discretion.

Accordingly, the decision of the Court of Appeals is

**AFFIRMED AS MODIFIED.**

**TOAL, C.J., KITTREDGE and HEARN, JJ., concur. PLEICONES, J., concurring in result only.**